May it please the court, Everett Delano on behalf of the appellant, Karan Zopatti, who's in the courtroom as well today. You know, I think I want to start off with something that describes the case a little bit because I think it's easy for us to fall into maybe a trap, if you will, of thinking of this case in a sort of traditional toxic tort context. And while there are certainly tort claims in this litigation, I think we'd be wrong to think of this case under that traditional rubric. And this is going to matter, of course, when I talk about causation in a minute. But really the nub or the heart of this case is in the disability statutes. I'm going to refer to them broadly. I'm going to be characterizing them generally because I think they share a common theme and purpose. But causation underlies all of these claims, right? That's what I'm going to get to in this distinction is exactly that. Because while in a traditional toxic tort kinds of analysis, there is certainly a causation burden that a plaintiff has. There's a different standard under the disability statutes. And that determination has really been made. It's been recognized by this court. But really that was made at a policy level by the legislatures, both at the state and federal level, in passing the disability statutes in the first place. The common theme, the common purpose of these disability statutes is to end the unnecessary exclusion of the handicapped from the American mainstream. So while we have this causation burden under the tort theories, there's a causal link requirement, which in my mind, as I'm arguing today, is really not the same thing as a causation burden. And to give you an example of that, take this court's decision in Giebler. In Giebler, this court ruled that the landlord in that case needed to allow the plaintiff's mother to co-sign a lease. Because, this court reasoned, the plaintiff's disability would not allow him to qualify for the lease by himself. And so although the landlord had a policy and practice of not allowing a co-signer, this court ruled that that was a reasonable accommodation that needed to be made. In Auburn Woods, the court ruled that the plaintiff needed to be allowed to have dogs, even though the policy of the landlord was not to allow dogs, because the plaintiff alleged they needed dogs to treat their severe depression. In Dadian, the court ruled that the landlord, the homeowners association, needed to allow the plaintiffs to construct an attached front garage, even though the policy was not to allow such construction. Let me ask you this. Assume, for the purpose of this question, that we will not reverse the district court's Daubert decision to disqualify Dr. Dahlgren. What's left of your case? A great deal. In fact, everything that I've just said so far addresses the summary judgment question. Because? Because of her treating physicians and because of her own testimony. Now, okay, let me specify further the assumption, and I'm not asking you to concede. Without the expert, I am assuming, for the purpose of this question, that we have no causal, physical disease mechanism by which the small amounts of pesticide trigger the physical reaction. It may very well be that the knowledge of the pesticide triggers the physical reaction because of the worry about it. I don't, for the purpose of this question, question the physical reaction, but I'm questioning the causal mechanism, and for purposes of my question, there's no direct physical medical causation simply because of the pesticide. It's rather the reaction to the fact of the pesticide. What's left of your case? Well, the treating physicians. Let's just start with. The treating physicians saying meaning what? So what their testimony would be, and of course not all of her treating physicians were deposed, but we have the records of some of them, and we have the testimony of those who were deposed. You have Harper. Isn't Harper, you say, your treating physician, but it seems to me he was really testifying on causation issue. He was testifying as an expert, not as somebody who applied this and applied that. It seems to me he fits into the category of expert. Do you have somebody else who's a treating physician? Yes, there are other treating physicians. I mean, the records show Dr. Calabresi, who treated Mrs. Zopatti previously, Dr. Ray, who treated Mrs. Zopatti previously, both of whom have recognized the relationship of toxic exposure to autoimmune conditions. You know, I think you're still not facing up to my question. Assume that you have no proof either through Dr. Dahlgren or through the treating physicians of a direct physical causation from the fact of these small amounts of pesticide to the physical reaction. I'm willing to assume, because it's right there on the record, that she is having various, very severe adverse physical reactions. But for the purposes of the question I'm asking you, well, what happens if the reason we're having these is that the knowledge of the distribution of the pesticide is producing the reaction? So what's left of your case if that is so? Then that would be, I believe it was the McClondon decision, I cited it in the briefing, in which this Court recognized that a somatoform disorder in and of itself is something that needs to be accommodated under the disability statutes. So even if it's, I hate the way that the appellees have put this, but all in... Causation is irrelevant if it's somatoform. If there's no causation at all but somebody thinks it is, that's enough. Well, again, it's a causal link. Is there a relationship between the defendant's practices and the appellant's disability? And so if the causal link there is, it's not that causation is irrelevant. It's what's that relationship? So I think if a neighbor's horse is making me sick, that's enough? If you had a disability that made you sick, that would be the distinction. And, of course, it wouldn't be the neighbor because the disability statute wouldn't apply to your neighbor. But if the disability statute applies to the entity, in this case the Fair Housing Act, right, and there is a disability, which I think the records clearly reflect that there are several disabilities that Mississippati suffers, then... Can you specify which disability now? Well, the autoimmune conditions that we have, and then Judge Fletcher's question is asking me the somatoform disorder. Right, exactly. But where does that analysis end? In other words, if it's a somatoform disorder and the person perceives the danger and therefore has substantiated physical manifestations, is there any place that that can be cut off? It seems to me that there's no place. Go ahead. No, I think absolutely. We have to remember what we're trying to achieve here, right? I mean, the disability statute is talking about attempting to level the playing field a little bit, if you will. So the analysis then would go to what's the reasonable accommodation, right? Depending upon the nature of the condition that's being harmed here, what is the accommodation? So if, for example, and again, I don't agree with the question, but I'm supposed to assume the question that this is only a somatoform disorder. So assuming that that were all that we were left to address, then the question would be, well, what kind of reasonable accommodations would be necessary for a person who is suffering these conditions and has this as their disability? Review for me quickly again. What's the basis in the record for the belief that there's a somatoform disorder operating here? Well, the appellees have made it initially, but they have now cited the fact that Dr. Dahlgren, and actually I believe Dr. Harper also testified, that yes, indeed, she is affected by these issues psychologically as well as physiologically. And so that's, I remember responding to Judge Fletcher's question on this point. I think the theory of the defense is that this is a somatoform disorder. Right. Okay. I guess for the purpose of the question, I'm taking the defense's argument. And if the defense wants to back away from his argument, thinking it might lose if it's a somatoform disorder, that's another question. Right. May I come back to, I mean, I do think, because I do think it's important to think a little bit about the treating physicians here. Because, I mean, I understand the notion, Judge Stein, you just asked, well, isn't Dr. Harper essentially acting as an expert? I mean, I don't think so. I mean, Dr. Harper, you know, it was pretty clear in his deposition, and, you know, there are portions of his deposition that are in the record, of course. But the question is, is treating Mrs. Zopatti in the manner that he treats people with the conditions that he sees? Now, you know, the trial court and the appellees were both quick to point out, well, but there are other doctors out there that have treated Mrs. Zopatti who haven't come to the same conclusion that Dr. Harper came to. You know, that doesn't surprise me. You know, I've been – I've visited more than one doctor, and they've had different opinions as well. But the fact of the matter is, there has never been a treating physician that has testified that there is no relationship, there cannot be a relationship between the exposures that Mrs. Zopatti has suffered and her autoimmune conditions. They've never said that. Dr. Salpi, for example, her general practitioner, said, well, you know, I don't treat autoimmune conditions, so I can't testify about this one way or the other. Dr. Kaplan, who interestingly enough, his office issued a note saying, please refrain from exposing Mrs. Zopatti to pesticides, insecticides, et cetera, because of her autoimmune conditions. At his deposition, he seemed to want to back away from that note by saying, well, that person doesn't work with me anymore. It's interesting what that means. But he never actually said, no, it's not possible for the chemicals that are being used by the appellees to affect Mrs. Zopatti's autoimmune conditions. What he said was, for me, for me, Dr. Kaplan, that's not enough. I'm not able to get there. So in other words, his position was he wasn't able to make that judgment based on the scientific evidence. But again, and I'm borrowing Daubert here a little bit. I know you asked me, Judge Fletcher, a moment ago to assume that Daubert, that we're going to lose the Daubert part. But if I could just borrow the Daubert analysis, because even if you don't use it for Daubert itself, I think the analysis is still relevant here. In the United States versus Grace, in Primiano v. Cook, in Kennedy v. Collagen Corporation, in each of those cases, this Court has said, look, Daubert is flexible. There isn't always exact scientific evidence in everything. The market is flooded with chemicals of all kinds that will treat all kinds of sides. These things are intended to kill something. Let me just interrupt for a second and then we can certainly go back. You're right. Daubert is quite flexible. It says it right in it. But the standard of our review from a Daubert determination of the district court judge excluding the witnesses is abuse of discretion. You have to deal with that as well. That is correct. Yes, I do. Yes. And that is different, of course, from the standard of summary judgment, which is de novo. But the point here in this is, I wanted to get it, I think it was in Primiano v. Cook, where this Court said, you may not always have scientific evidence for everything. It's understandable. When we have so many new chemicals coming on the market all the time, you're not going to have that level of scientific review. Yes. Okay. Here's a problem I've got. I'm given in the briefing and in a lot of the statements descriptions of the diseases from which Ms. Zilpati suffers. I noticed that the two doctors who are the experts on the defense side refer to mixed connective tissue disease and say that, at least it's Dr. Saxon, says, well, that disease is stabilized a long time ago. What do we have on the record as to what diseases she actually suffers from? And my understanding is that mixed connective tissue disease overlaps with, but is not the same thing, for example, as lupus. And Dr. Saxon doesn't discuss lupus. I mean, what do we know about it? Put to one side causation for the purpose of this question. What do we know about the diseases from which Ms. Zilpati suffers and for which we have an accurate diagnosis? How much fighting do we have about those diagnoses? I hope there isn't a lot of fighting. There's a great deal of evidence on this. There's some fighting. Dr. Saxon says she doesn't have or she has a stable MCTD. Yeah. Well, okay. But her treating physicians, Dr. Kaplan, some of the other doctors, it's all in the record. I mean, mixed connective tissue disease, polymyositis, scoloderma, lupus, rheumatoid arthritis, among other conditions, that's all in the record in numerous places. Dr. Kaplan, among others, testified that those conditions, they're ongoing. They flare, they're aggravated. Of course, our position is they're aggravated by exposure to chemicals. Well, we do know, for example, that lupus is aggravated or you're going to flare from stress. I mean, I don't think that's a dispute. Right. Right. So stress is one of the factors. Our position, of course, is the chemical one. In other words, somatoform disorder, stress produces flare-ups of the symptoms. Yes. Precisely. So how do I know she has lupus? It's in the records. I mean, I could, if you'd like, I could. Do they contest that she has lupus? I guess I'll ask them. I'd better ask them. I don't know. I probably should save some time for a response at this point unless there's anything else the Court has for me. Okay. Let's hear from the other side. We'll make sure you get a chance to respond. Good morning. Dale Britton for Rancho Dorado and Prescott. Sounds like the Court is pretty in tune with what's going on here, so. Don't take questions necessarily to be our end point. We're asking, I ask questions very often just to flesh out what the response is. Go ahead. Understood, but I wanted to see if there was a particular question you wanted me to answer right up front. Well, I guess I'll start out with what parts of the diagnoses of the diseases from which she suffers, putting causation to one side, do you contest? Does she have lupus? Frankly, I'm not in a position to contest that one way or the other. Does she have rheumatoid arthritis? We don't contest that. Mixed connessive tissue disease? I don't know about that one. Why don't you know about that one? Dr. Saxon talks about it endlessly. Her claim has been that she has multiple chemical sensitivity. We contest that. I understand that. No, I'm trying to figure out what isn't contested. And Dr. Saxon says she had mixed connective tissue disease, but that is now stabilized. Correct. What basis does he have for saying that? Has he examined her? Not that I'm aware of. Okay. But you don't contest lupus. You don't contest rheumatoid arthritis. I'm not contesting those. You may or may not contest the others. Correct. Okay. And that's for the purpose of this hearing, obviously a trial that would potentially be different. Sure, sure. I think the court has seen the point here, and that's that there is no link between the appellant's disability and the actions that are being taken. The disability claimed is multiple chemical sensitivity. Well, my questions were all based on an assumption. You're now taking my assumption as if I agree with my own assumption. Okay. Maybe that's a bad idea. Yeah, it might be. Then it's our position that Dr. Dahlgren and Dr. Shader were properly excluded because they did not have an adequate basis to find that she would be injured by exposure to pesticides or any other chemical. Even assuming for the moment that we agree with the decision to exclude those experts, and I want to come back to that. Can there be an inference simply from the fact that she was exposed, they were spraying pesticides in back of her home, and the fact that there's a temporal relationship between the spraying of the pesticides and a flare-up of these symptoms, are we entitled to make the inference of causation without the expert testimony? I don't believe so. Mere temporal links such as that are not found to be sufficient to support an expert's position. Secondly, the one time that she went and got tested shortly after an exposure, she tested negative for any sort of chemical problem. I believe that was May 2009. There simply is no evidence that these pesticides or chemicals are causing her any difficulties. No one has found that. While I'm on the subject, no one has diagnosed her with somatoform disorder to my knowledge. It doesn't mean you're in total argument that she has it, however. That's what their guys admit, that she may have somatoform disorder. We can't rule that out. I read Dr. Saxon. In derogatory terms, he says she has somatoform disorder and it's, quote, all in her head. I mean, that's his theory as to why he's so sort of, he's got kind of harsh language in here, but basically he's saying, listen, it's all in her head, and that's a non-fancy derogatory term for somatoform disorder. Okay, all in her head, which I, of course, would agree with. Now, okay, all in her head, what that means is, at least I assume what it means, certainly what it meant to Dr. Saxon is that she thinks that pesticide exposure is bad for her. Because she thinks that pesticide exposure is bad for her, even in minute amounts, she has these physical reactions. Assume that that's true, then what? Why isn't that a disability? That's a never-ending analysis. There would be literally no way to draw that line. Anybody at any time could do, as was suggested and simply say, you know, that horse scares me, the fact that there are dogs in my neighborhood scares me because I don't like dogs, therefore dogs need to be banned in this apartment complex or this HOA. Well, it has to rise to the level of disability. I understand that. I'm merely being afraid that dogs don't necessarily come to that level. And, of course, there's a possibility that people will lie. I understand that, too. But what happens if we have a genuine psychological state that is disabling in the way that I have just hypothesized? Well, the disability statutes require reasonable accommodations to be made. They don't require draconian steps to be taken, such as simply banning the use of all chemicals in a neighborhood. Well, have we gotten to the stage of your client ever saying, well, let's figure out a reasonable accommodation? Yes. They were offered several times, and she refused to respond. The only reasonable accommodation she eventually offered was, I believe, a year and a half after this issue first came up. And it may have been longer, but in any event, they asked for a quarter-mile radius. Did the district judge rule as to whether or not there had been a bona fide attempt to accommodate? Not that I'm aware of. I don't think so. Was the case ever presented in the district court on the basis of this is a somatoform disorder of some kind, some kind of a psychological disorder that rises to the level of disability under the Act, and therefore that's enough? This is news to me. It was not presented. As I said, it was presented as a multiple chemical sensitivity or NCS problem. We argued it as such. There was a large shift in gears when the other side stood up and started presenting the case. Exactly. We argued that MCS is not causing her any problems, at least not due to any chemicals that we apply, and now it's apparently a fear case. This was not argued below. I didn't see it at all. Maybe the other side can tell me where I missed it. I didn't see it. But in any event, I don't believe that there is an obligation on the part of a homeowners association to refrain from applying chemicals in the event that somebody thinks they may be damaged by chemicals. Okay. Well, let's get back to the other case. Then the other side says the treating physician in her own testimony might be sufficient to create a genuine dispute that ought to go to a jury. Your reaction to that is what? No treating physician has said that chemicals are causing her injuries. They all say things like, we can't rule it out. I believe that was Dr. Dahlgren. It may be fear. I believe that was Dr. Harper. Somatoform disorder from Dr. Harper. These are various people who say we don't know what's going on, basically. No one has come out and said pesticides are causing her injuries, and I can say so to a reasonable degree of medical probability. In the absence of that evidence, there's simply no... So then you're left with a plane of saying the pesticides are causing this, and your argument, of course, is the same, that's not enough. Of course. You know, I don't think you're accurately describing Dr. Harper's affidavit. As I read his affidavit, he says these things are causing the physical injury. He was later deposed. Your client, I mean, your expert's action calls him a quack, calls him a, quote, fringe physician, but as I read his affidavit, he says there's a causal relation. And it may or may not be true, but that's what he says. Well, he admitted that it could be fear rather than the chemicals themselves. I believe that was in his deposition. I don't have that. So in the deposition, does he take back the import of the affidavit? Take it back. Well, I mean, you're saying the deposition undercuts what he said in the affidavit. Absolutely. Well, as I read both the deposition and the affidavit, it is he says that there's the physical reaction from the chemical itself, and surprise, surprise, he's also afraid of it. So, yeah, both things are going on according to Dr. Harper. Well, to the extent that he's saying it may just be fear, that obviously undercuts any opinion he may have. As I read it, I don't think he ever said it's just the fear. I don't believe he did either. Like I said, he says it could be fear, it could be something else. We can't rule these things out. No, you know, you're reading something that Dr. Harper wrote that I never read, and I read his deposition and I read his affidavit. I do not regard you, in other words, as accurately summarizing what he wrote and what he said. Well, my apologies, Your Honor. What part do you have the deposition in front of you where you say? I don't. It's over there. I could go find it. Okay. Okay. Can you give us the citation to the parts that you want us to read that you say destroy the affidavit? It'll take me a moment to find it, but, yes, I believe I can. It's in your brief? It is. Okay. With that said, I think the Court has also pointed out something that I don't believe has been significant or sufficiently addressed by the appellant, and that's the fact that this is an abuse of discretion standard that we're dealing with here. They have not shown the trial court abuse of discretion in excluding this evidence, and I think given the fact that the information relied upon by Fader and Dahlgren, which was insufficient, as well as the fact that neither of them are able to testify or opine conclusively that she was exposed to a significant amount of chemicals, or really even any amount of chemicals, according to Dr. Fader, and with regard to Dr. Dahlgren, he cannot opine that these chemicals are causing her injuries. What if, and this is way down the list of causes of action alleged, why don't we have a cause of action here for negligent infliction of emotional distress? I mean, that's been pled. It has been. So why is that not a good cause of action? A couple of reasons. First, it requires that it be something that would distress a person of normal health and sensibility, and that just doesn't exist here. I mean, with all due respect, Ms. Zapati, she's not of normal health, and the fact that pesticides are sprayed in the neighborhood. Is that really California law? Well, what happens if I know that someone is unusually susceptible to X, Y, or Z, and negligently I do exactly that, causing the distress? That's not a cause of action in California law? It has to be incredibly severe behavior on top of being this normal health and sensibility. It has to be something shocking, something completely beyond the pale of normal human endeavors, all that sort of stuff. There's all kinds of quotes in the cases that describe the extent that someone has to go to in order to have a negligent infliction claim, and routine landscape maintenance just does not apply. Even if, and I have to say, I'm tempted to agree with you, but I'm trying to work my way through this one because according to, I don't know how much proof we have in it because there's not been much evidence on this point, or at least not much emphasis on it. Apparently, before they moved into this development, they asked about pesticides, and according to them were promised that, no, we don't use pesticides. The precise detail of it I'm a little unclear on, but apparently the Homeowners Association was on notice when they moved in, and they made some representation that reassured them. Having done that, assuming now that they are on notice, does that give them some obligation to avoid the behavior? This is not a contract suit. In fact, I'm a little mystified why it's not a contract suit, but the obligation or on notice is then relevant to infliction of emotional distress if they know that this is going to happen if they do X. She never told anybody that she had a disability that required that no chemicals be sprayed. A lot of people ask questions about environmental policies. Do you use pesticides? Are you a fair trade organization? Things like that. But there was no indication that she had MCS before she moved in, no indication that she couldn't be near any chemicals before she moved in. In fact, as we went into it, lengthened the brief, it took over a year, I believe, for her to simply acknowledge the fact that she had a disability in the first place. We kept asking what the disability is. She doesn't say anything about it, doesn't respond to the letters, and eventually we get the information about MCS. But up until that point, there was no information that we had that chemicals in and of themselves were a problem for her because of an MCS issue or a somatoform issue or whatever. You point out that Dr. Dahlgren has not fared well in three other courts, that his opinions have been rejected for the failure of adequate foundation and all the rest. Sounds like you did a pretty good background check on Dr. Dahlgren. Is it relevant that he was rejected as an expert in other courts? I believe so. Well, you believe so, or is there any case that says this is the type of thing you do? It's more that I believe so, to be perfectly honest. I'm sorry, excuse me? It's more that I believe so. I don't know of any case offhand in which the fact that this expert has been rejected. In your background check, were there any cases where his opinions as an expert were accepted? No. So he's zero for three. As far as I know, zero for three. I don't know about any cases that may have happened since we filed our papers. I just don't know if there have been. Did he ever say anywhere, and sometimes experts say, and my opinions have been accepted as gospel and X, Y, Z cases. Nothing like that appears in this case. I don't recall that at all. And if we're about to find out that his opinion was accepted in three other cases, then what? Tie favors the runner, right? Or you didn't do your research, or you can't remember it. I researched Dr. Dahlgren to the extent I could. I ran his name through Lexis, and that's what I came up with. I don't know if there are other cases. And with that, I will submit unless there are further questions. I'm sorry. So if it was LexisSearch, what you're talking about is published decisions? Actually, no. LexisReturn. I'm a little fuzzy, frankly, on what LexisReturns for you, but it does return things that are not, quote, unquote, published. I don't know if there were, like, memorandums or something like that where he has been accepted. But as far as that is concerned, yes, just what I could find on Lexis. Okay, thank you. Thank you. Let's put two minutes on the clock and see what happens. Thank you. Let me start with the last one, which I think, first of all, I think there are cases, and I think Dr. Dahlgren testified as to cases in which his opinion has been accepted. I think that's in the testimony, but I don't remember at the moment where that stands because it really doesn't matter and those decisions are distinguishable, as I pointed out in the briefing. I want to get to the question of the evidence. Judge Fletcher, you had asked what evidence is there of her current conditions. Just as examples of that evidence, because it's in several places in the excerpts of record, but on page 5-002 is a discussion from Dr. Harper. On page 6-011 is a discussion from a Dr. Nolan. He mentions mixed connective tissue disease, scoloderma, polymyositis, and there's a series of other thyroid disease, depression, colitis, reactive airway disease. So at least for purposes of summary judgment, we've got these diseases. Yes, thank you. What about Judge Stroud's question about shifting gears? Yeah, I may have missed something completely. I missed the idea that a fear of something that rises to the level of a disorder recognizable under the ADA is enough to get you there, sort of bridges over causation because it itself is causation. Was that your theory below? I missed that. We did argue it. This is not an argument that we pulled out for the Ninth Circuit. We did argue it below, but it has not, it has never been. The focus of this case, because our view is that these are really, truly physiological issues. Yeah, that's the point. Right, but we did argue. Your fallback is, well, if they're not, then they're. . . Honestly, it started when Dr. Saxon and I forget the other expert's name now, sorry, that they had, when they raised somatoform disorder and then in the depositions of Dr. Dahlgren and of Dr. Harper, et cetera, well, do you think, Mrs. O'Patty, this is all in her head? So it was really actually responding to that that we then said, well. . . Okay. So it was never your affirmative theory going into the case. That's correct. All right. That's correct. But it is, I think, a cognizable issue. But where, and I want to just bear down on this because I think it is important. You know, are we going to sandbag the district judge? What did you say in the district court to alert the district judge that if he rejects the physical scientific causation, you nonetheless have a good cause of action based on somatoform disorder? We raised the very same case that I've raised before with this Court, the McClendon decision in which this Court ruled that a somatoform disorder is something that needs to be treated pursuant to the disability statutes. I believe that was an employment law context, not a fair housing context. I'm just. . . I want this to be as specific as possible because I'm going to go back and look for it. Yes. Where in the record do I find either in transcript or in papers filed with the district court that you say to the district court, somatoform disorder, we nonetheless have a good cause of action? We said that, and I know I made that argument at the hearing on the summary judgment. Where did you make it in your briefs to us? Yes. Where? Can you bear with me? Opening brief. Just a second. Page. . . And actually, this paragraph, by the way, is probably almost a direct copy from the paragraph to the opposition to the trial court. Don't go there. Okay. Where? Page 47 of our opening brief. Furthermore? Yes. If the last sentence there I think really summarizes it here, that this court granted the lower court's grant of summary judgment reasoning that the plaintiff's alleged fear reaction and communicative paralysis were sufficiently severe to raise the genuine issue of material fact. That's precisely what. . . All right. Furthermore. . . Okay. And you say if we go back, and what transcript I look for you having raised this in the district court? Yes. The hearing on summary judgment motion? Yes. On the summary judgment motion. I believe the summary judgment motion in the Daubert hearing were at the same time, if I'm not mistaken, if I remember that correctly. Okay. May I just say one thing about. . . If you have something like that, you don't bury it in a furthermore. It might be a nice Roman nuberal, especially if you start your oral argument with that proposition. Oh, I didn't. I got directed there, but that's okay. Yeah. Reasonable accommodation, just really quickly, because the court was asking appellees' counsel. No. The trial court has never ruled on a reasonable accommodation. That's never been. . . We've never gotten there because of these. . . District court. . . Once the district court gets rid of the experts and the district court's view, the case is over. Right. So we never got to a reasonable accommodation. Okay. Oh, one other thing. Just real quickly, I know. Yeah, yeah. But just real quickly, Mrs. Zopati had agreement with the Homeowners Association head of the Landscape Committee years ago. So, yeah, and this is evidence that should go to trial, evidence of that. But you didn't. . . This is not a contract case. I'm a little mystified why it's not, but it's not. I'm not saying that. I'm just saying for purposes of when the appellees knew. Okay. They knew sometimes. Okay. Thank you very much. Zopati v. Rancho Dorano, Homeowners Association now submitted for decision. Anybody need a break? Next and last case on the calendar this morning, Barry Schei and Manhattan Loft v. Insurance Company of the State of Pennsylvania.
judges: Stein, Trott, Fletcher